## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Days Inns Worldwide, Inc.,                              Civ. No. 10-609 (MJD/JJK)

　　　　　　　　Plaintiff,

v.                                                      **REPORT AND RECOMMENDATION**

Investment Properties of Brooklyn
Center, LLC, and Peter C. Vang,

　　　　　　　　Defendants.

## INTRODUCTION

This matter is before the Court for a Report and Recommendation on Plaintiff's Motion Default Judgment as to Defendant Investment Properties Brooklyn Center, LLC  (Doc. No. 66).  *See* 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.   For the reasons set forth below, this Court recommends that Plaintiff's motion be granted in part and denied in part.

## PROCEDURAL BACKGROUND

This case arises from the closing of a Days Inn hotel in Brooklyn Center, Minnesota, in March 2007.   Defendant Investment Properties of Brooklyn Center, LLC ("Investment Properties") was the franchisee entity that operated the hotel pursuant to a License Agreement with Plaintiff franchisor Days Inn Worldwide, Inc. ("DIW").   Individual Defendant Peter C. Vang guaranteed Investment Properties' obligations under the License Agreement.

DIW originally filed this case in New Jersey, suing Investment Properties

and Peter Vang for royalties and other fees that had accrued but had not been paid before the License Agreement was terminated, as well as post-termination lost future royalties and fees.  Investment Properties initially failed to appear in the New Jersey action and defaulted but the court ultimately vacated the default and Investment Properties submitted an answer signed by the attorneys representing it.  (Doc. Nos. 19, 21.)

The case was then transferred to this district upon Defendants' motion. However, after the transfer there was no appearance filed by any counsel for Investment Properties and Investment Properties did not appear at this Court's initial conferences.  Its prior New Jersey counsel advised Plaintiff's counsel that they had terminated their representation and were not appearing in Minnesota.

On May 20, 2011, this Court issued an Order to Show Cause why Investment Properties' answer, filed in New Jersey, should not be stricken because no attorney had filed an appearance for Investment Properties as a corporation may not proceed *pro se* in this district.   (Doc. No. 55.)  Defendants were warned that failure to comply could result in a default judgment.  (*Id.*)

Defendant Peter Vang then informed this Court on May 27, 2011, that he intended to appear individually *pro se* and that no counsel would be hired to represent Investment Properties due to financial difficulty.   (Doc. No. 56.)   He acknowledged that, as a corporation, Investment Propertied needed counsel in

order to proceed in this district, but indicated that the corporation had not been operating since March 2007 and had been administratively terminated by the Minnesota Secretary of State on January 7, 2007.   (*Id.*)  On June 1, 2011, this Court ordered the Answer of Investment Properties stricken, and Peter Vang proceeded *pro se.*  (Doc. No. 58.)

DIW then brought the instant motion for default judgment against Investment Properties, and a motion for summary judgment against Peter Vang. (Doc. Nos. 66, 72.)   Both matters were referred to this Court and set for hearing on August 10, 2011.  (Doc. Nos. 71, 73, 78, 79.)  On July 27, 2011, Peter Vang made a Rule 68 offer of judgment in the amount of $13,316.13.  (Doc. No. 83.) In written correspondence to the Court and at the default judgment hearing, DIW advised the Court that it would accept the Rule 68 offer of judgment, thus mooting the summary judgment motion against Peter Vang.  (Doc. No. 82.) Accordingly, the summary judgment hearing was cancelled.  (Doc. No. 84.)

The Court held a hearing on the default motion on August 10, 2011 to determine whether DIW had proven its claimed damages with the requisite degree of certainty to justify the imposition of the money judgment sought by DIW.   DIW submitted two affidavits and supporting documents in support of a claim of $1,124,519.62 in damages from Investment Properties, plus an award of $36,347.70 in attorney's fees and costs.   (Doc. No. 68, Aff. of Suzanne

Fenimore ("Fenimore Aff.") ¶ 35; Doc. No. 69, Aff. of Erica Duelks "Duelks Aff.") ¶
19.)   No appearance was made on behalf of Defendant Investment Properties.
(Doc. No. 85.)   The clerk's entry of default was entered on August 22, 2011.
(Doc. No. 87.)

## FACTUAL BACKGROUND

DIW is a corporation organized and existing under the laws of the State of
Delaware with its principal place of business in Parsippany, New Jersey.  (Doc.
No. 68, Fenimore Aff. ¶ 3.)  It does not own or operate any hotels.  (*Id.* ¶ 5.)
Instead, DIW operates a guest lodging facility franchise system comprised of
federally-registered trade names, service marks, logos, and derivations thereof
(the "Days Marks"), as well as the Days Inns® System.   (*Id.* ¶ 5.)  The hotels
operating as part of the Days Inns franchise system are all independently owned
and operated.  (*Id.* ¶ 6.)  DIW allows its franchisees, pursuant to individual
license agreements, to operate their hotels as Days Inn guest lodging facilities
utilizing the Days Marks and the Days Inns® System.  (*Id.*)

On or about July 22, 2004, DIW entered into a License Agreement with 1
Village Properties, LLC ("1 Village Properties") for the operation of a 220-room
guest lodging facility located at 1501 Freeway Blvd., Brooklyn Center, Minnesota,
Site No. 02513-85138-3 (the "Facility").   (*Id.* ¶ 7.)   On or about April 27, 2005,
DIW entered into an Assignment Agreement with 1 Village Properties and

Investment Properties (the "Assignment Agreement"), wherein Investment Properties assumed and accepted all rights and obligations of 1 Village Properties under the License Agreement.   (*Id.* ¶ 8.)

Pursuant to Section 5 of the License Agreement, Investment Properties was obligated to operate a Days Inn® guest lodging facility for a fifteen-year term.   (*Id.* ¶ 9.)  Investment Properties was also required to make certain periodic payments to DIW for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively, "Recurring Fees").  (*Id.* ¶ 10.)   And Investment Properties was required to prepare and submit monthly reports to DIW disclosing, among other things, the amount of gross room revenue earned by Investment Properties at the Facility in the preceding month for purposes of establishing the amount of the Recurring Fees due to DIW.   (*Id.* ¶ 11.)  Investment Properties also agreed to pay interest on any past due amount owing to DIW at the rate of 1.5% per month or the maximum rate permitted by applicable law.  (*Id.* ¶ 13.)

DIW could terminate the License Agreement, with notice to Investment Properties, for various reasons, including Investment Properties' failure to continue operating the Days Inn guest lodging facility.  (*Id.* ¶ 14.)   Pursuant to Section 11.2 of the License Agreement, Investment Properties agreed to pay to DIW damages suffered by DIW due to the premature termination of the fifteen-

year License Agreement, including "amounts which would otherwise be payable for and during the remainder of the unexpired Term of the License Agreement but for such termination."  (*Id.* ¶ 15.)  Pursuant to section 17.4 of the License Agreement, Investment Properties agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement."  (*Id.* ¶ 16.)

On October 18, 2005, June 16, 2006, and October 31, 2006, respectively, Investment Properties failed quality assurance ("QA") inspections of the Facility. Investment Properties thereafter failed to cure its QA defaults.  (*Id.* ¶ 17.)   As a result, Investment Properties was in default of its obligations under the License Agreement and, pursuant to Section 18.5 thereof, it lost any right it had under that section to terminate the License Agreement.   (*Id.*)   On March 18, 2007, however, Investment Properties unilaterally terminated the License Agreement by selling the property to the Brooklyn Center Economic Development Authority and ceasing to operate the Facility as a Days Inn guest lodging facility.   (*Id.* ¶ 18.)  By letter dated March 27, 2007, DIW acknowledged the termination of the License Agreement and advised Investment Properties that it was required to pay to DIW damages for premature termination and all outstanding Recurring Fees through the date of termination.  (*Id.* ¶ 19.)

6

**DISCUSSION**

**I.    Standard of Review**

Federal Rule of Civil Procedure 55(a) provides that the clerk of the court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Fed. R. Civ. P. 55(a).   Once an entry of default is entered, the Court may then consider a motion for default judgment pursuant to Rule 55(b)(2).  Under Fed. R. Civ. P. 55(b)(2), when considering whether to enter default judgment,

> [t]he court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to:
>
> (A)    conduct an accounting;
> (B)    determine the amount of damages;
> (C)    establish the truth of any allegation by evidence; or
> (D)    investigate any other matter.

"[A] party entitled to judgment by default is required to prove the amount of damages that should be awarded."  *Oberstar v. Fed. Dep. Ins. Corp.*, 987 F.2d 494, 505 n.9 (8th Cir. 1993); *see also Martinez-Bautista v. D & S Produce*, 447 F. Supp. 2d 954, 964 (E.D. Ark. 2006) (same).   The damages on default must be proven with a "reasonable degree of certainty."  *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818–19 (8th Cir. 2001).

7

## II.     Analysis

DIW now seeks a default judgment in an amount in excess of $1.1 million against Investment Properties.  This includes:  (1) Recurring Fees of $33,622.21, that were outstanding at the time of the termination of the License Agreement, plus $25,732.16 of interest on that amount; (2) "actual damages" of $1,065,165.25, which is DIW's computation of the lost revenue that DIW would have allegedly received from Investment Properties, reduced to present value, if Investment Properties continued to operate the Days Inn for the remainder of the twelve years in the License Agreement term after termination; and (3) attorney's fees and costs totaling $36,347.70.  (*Id.* ¶¶ 25, 26, 32; Doc. No. 69, Duelks Aff. ¶ 19.)

### A.     Accrued Fees and Interest

As stated above, DIW is seeking royalties and other Recurring Fees in the amount of $33,622.21 that were outstanding at the time of the termination of the License Agreement.  (Doc. No. 68, Fenimore Aff. ¶ 25.)  The amount of these past due Recurring Fees was calculated by DIW using an Itemized Statement for the Facility dated June 14, 2011.  (*Id.* ¶ 21.)

For the months of January, February, and March 2007, Investment Properties failed to report gross room revenues earned at the Facility to DIW. (*Id.* ¶ 22.)  Therefore, DIW could not calculate the Recurring Fees based on the

8

actual gross room revenue earned at the Facility for those months.   (*Id.*)   DIW therefore estimated the Facility's Recurring Fees for those months by using the actual gross room revenues reported by the hotel facility for the same months in the prior year.   (*Id.* ¶ 23.)   This Court finds that this was a fair and reasonable way to estimate these accrued fees.   Accordingly, this Court concludes that the amount of $33,622.21 is due and owing and recommends that judgment in this amount be entered against Investment Properties.

This Court likewise concludes that DIW is entitled to interest on the above amount calculated at the legal, contractual rate of interest of 1.5% per month (or 18% per year) from March 18, 2007 (the date of termination) through June 17, 2011 (the filing date of this motion), which is a total of 1552 days at $16.58 per day, equaling $25,732.16--the amount of interest sought by DIW.   (*Id.* ¶ 26.)

**B.    "Actual Damages":  Lost Future Revenues**

DIW also claims that it is entitled to "actual damages" it allegedly suffered as a result of the premature termination of the License Agreement twelve years before the end of the fifteen-year term of the Agreement.   (*Id.* ¶ 27.)   To that effect, it seeks the future revenue that Investment Properties would have paid over the twelve-year period.   DIW used the following method to calculate the actual damages.   First, it considered the actual fees that Investment Properties was obligated to pay DIW during the last twelve months of the hotel's operation.

9

This amounted to $101,717.91, or $279 per day.   (*Id.* ¶ 29.)   DIW then:  (1) calculated that there were 4,505 days remaining in the term of the License Agreement after the termination; (2) made the assumption that Investment Properties would have become obligated to pay $279 per day in license fees over the 4,505 days; (3) multiplied $279 by 4,505 for a total of $1,256,895.00; and (4) made a present value calculation of this amount for "actual damages" of $1,065,165.25.  (*Id.* ¶¶ 30, 31, 32.)

This Court disagrees with DIW's method of calculating lost future profits, and finds that these damages are too remote, uncertain, and speculative to be recoverable.  "Lost profits are one measure of compensatory damages that may be recoverable in a breach of contract action, if they can be established with a reasonable degree of certainty."  *RSB Lab. Serv. Inc. v. BSI Corp.*, 847 A.2d 599, 608 (N.J. Super Ct. A.D. 2004) (internal quotations omitted).  Here, the franchise fees paid by Investment Properties to DIW were based upon gross room revenues generated by the hotel operations.  There is no support underlying DIW's contention that it can estimate, with any reasonable degree of certainty, what these revenues would be over the remaining twelve years of the term of the License Agreemnt.  As one court recently noted in *Howard Johnson Int'l, Inc. v. Inn Dev., Inc.*, Civ. No. 07-1024, 2009 WL 2920819, *9 (D.S.D. Sept. 11, 2009):

> Many factors may influence the profitability of a hotel franchise, such
> as changes in the location or formation of highways; changes in

10

> traffic patterns; the cost of gas and oil; and the general ability of the
> public to use hotel facilities. . . . Because of the inexactitudes of
> these factors, running a [hotel] franchise is a gamble.

*Id.* (internal quotations omitted) (quoting *Ramada Franchise Sys. Inc. v. Motor Inn Inv. Corp.*, 755 F. Supp. 1570, 1578 (S.D. Ga. 1991); *see also Howard Johnson Int'l, Inc. v. HBS Family Inc.*, Civ. No. 96-7687, 1998 WL 411334, *8 (S.D.N.Y. July 22, 1998) (Sotomayor, J.) (holding that Howard Johnson was entitled to actual damages as a result of its franchisee's breach of licensing agreement, but suggesting that lost income for the entire fifteen-year term of the agreement was unreasonable).  Here, DIW has done no more than have its "Director of Contracts Compliance" do the arithmetic involved in projecting out $279 per day for 4,505 days and then present valuing the result.  It has provided this Court with no proof regarding:  competitive market conditions in the relevant market, its own expansion or contraction in the relevant market since 2007, its historical accuracy in forecasting future revenue streams from franchised hotels, or its ability to forecast economic trends.

In other contexts, courts have concluded that a two-year time period is a reasonable measure of a franchisor's damages for breach of a hotel franchise agreement because that is the average time it takes a franchisor to find a replacement franchisee.  *See Ramada Franchise Sys.*, 755 F. Supp. at 1579 (stating that "there is no dispute here that two years is the average time it takes

11

to find a replacement").  In this case, however, DIW has presented no evidence

from which this Court can determine how long it likely would take DIW to replace

the subject property in this geographic location.   Other than a general statement

from the Director of Corporate Compliance that DIW has been unable to license

a new Days Inn guest lodging facility in Brooklyn Center, Minnesota, DIW has not

detailed any efforts that it has made to mitigate its damages by finding another

franchisee and opening another hotel in this market.   *See Inn. Dev., Inc.*, 2009

WL 2920819, at *9  (holding that the hotel franchisor would not be entitled to

damages for the entire fifteen-year term of the contract unless it could

demonstrate that it would be incapable of mitigating the damages for that entire

fifteen-year period of time).  It has done no analysis of the state of hotel

competition in the relevant market; nor has it analyzed whether customers were,

or could have been, shifted to other Days Inn-branded hotels in the Twin Cities.

By allowing DIW to obtain a judgment for the twelve-plus-year-stream-of-

income—the judgment sought by DIW—the Court would be encouraging DIW to

commit economic waste by putting forth no efforts to mitigate its damages.

*River Rd. Assoc. v. Chesapeake Display and Pack. Co.*, 104 F. Supp. 2d 418,

424 (D.N.J. 2000).   Accordingly, DIW's lost revenue "actual damages" in the

amount of $1,065.165.25 should be denied.

12

## C.     Attorney's[1] Fees

_____

[1]     In reviewing Plaintiff's request for "attorneys' fees", (*see* Doc. No. 67, Pl.'s Mem. at 1, 4, 5), this Court stumbled into a style and usage skirmish that is reminiscent of the egg-cracking dispute between Lilliput and Blefuscu.  *See* Jonathan Swift, *Gulliver's Travels*, at 40-41 (Signet Classics, 1999).  In *Gulliver's Travels*, the two nations warred over whether the big end or the little end of the egg should be uppermost when the egg was eaten.  *Id.*  Likewise, in the federal reporters, numerous courts have struggled to resolve the "stylistic dilemma of whether to use 'attorney fees,' 'attorneys fees,' 'attorney's fees,' or 'attorneys' fees'. . . ."  *Ridder v. City of Springfield*, 109 F.3d 288, 290 n.1 (6th Cir. 1997); *Haymond v. Lundy*, 205 F. Supp. 2d 403, 406 n.2 (E.D. Pa. 2002) ("The court must first decide a threshold issue of style.  Is Lundy's petition best read as a request for: (1) an 'attorney fee;' or his (2) 'attorney fees;' (3) 'attorney's fee;' (4) 'attorney's fees;' (5) 'attorneys fee;' (6) 'attorneys fees;' (7) 'attorneys' fee;' (8) 'attorneys' fees;'. . .?").

After "survey[ing] the landscape," some courts have adopted "attorney fees" as an acceptable, albeit "inelegant" form.   *Ridder*, 109 F.3d at 290 n.1.  Others courts have opted for "attorney's fees," following the Supreme Court's Manual of Style.  *See Haymond*, 205 F. Supp. 2d at 406 n.2; *Hobbs v. Blue Cross Blue Shield*, 276 F.3d 1236, 1239 n.2 (11th Cir. 2001) (stating that "attorney's fees" is the proper use, except when quoting other inconsistent authorities).  Numerous other courts have used the plural possessive "attorneys' fees" which, according to Bryan Garner, "is just as good, and some may even prefer that term in contexts in which there is clearly more than one attorney referred to."  Bryan A. Garner, *A Dictionary of Modern Legal Usage* 91 (2d ed. 1995).

Notably, courts in the Eighth Circuit have used all these forms somewhat interchangeably.  *See, e.g., Fair Isaac corp. v. Experian Info Solutions, Inc.*, ---F.3d---, 2011 WL 3586429, *9 (8th Cir. Aug. 17, 2011) (using "attorneys' fees"); *D.J.M. ex rel. D.M. v. Hannibal Public Sch. Dist. No. 60*, ---F.3d---, 2011 WL 3241876, *3 (8th Cir. Aug. 1, 2011) (using "attorney fees"); *Hanson v. Loparex, Inc.*, No. 09-1-70 (SRN/FLN), 2011 WL 3609381, *6 (D. Minn. Aug. 15, 2011) (using "attorney's fees"); *Farnham Street Fin., Inc. v. Balaton Group, Inc.*, No. 10-4277 (MJD/FLN), 2011 WL 1258512, at *2, *6–7 (D. Minn. Mar. 30, 2011) (using "attorney's fees").  For uniformity's sake, this Court will adhere to the Supreme Court Style Manual's use of "attorney's fees."

Section 17.4 of the License Agreement requires Investment Properties to "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement." (Doc. No. 68, Fenimore Aff. ¶ 16.) DIW has submitted an affidavit from one of its attorneys claiming that it is entitled to $36,347.70 in attorney's fees and costs. (Doc. No. 69, Duelks Aff. ¶ 19.) This is based on a calculation that its New Jersey attorneys, the firm of Day Pitney, spent 86.8 hours on this matter at a blended hourly rate of $245 for a total of $21,267.00, plus a "flat fee" of $6,000 that Day Pitney charged for "preparation, filing, and service of the Complaint and preparation of initial disclosures and discovery requests," plus $9,080.70 in expenses, including the retention of local counsel Larkin Hoffman Daly & Lindgren Ltd. (*Id.* ¶¶ 15, 17, 18.) The Court finds, based on its review of the work involved in this matter, that the stated amount of attorney's fees and costs is unreasonable for the handling of this default case against Investment Properties. The Court recognizes that there was some work involved in bringing the claim in the District of New Jersey, including preparing the complaint, and the first default motion, and defending the motion to transfer venue, but there was very little work required in Minnesota where Investment Properties did not appear. The only possible explanation for this high level of attorney's fees is that

DIW has included here all of the legal work incurred in connection with its attempt

to obtain a judgment against guarantor Peter Vang.   But DIW is not entitled to

lard up its judgment against Investment Properties with fees it incurred in

pursuing its claim against guarantor Vang.  DIW accepted Vang's Rule 68 Offer

of Judgment and, to the extent that DIW had any claim for its attorney's fees

against Vang, it was subsumed in that judgment.  Therefore, this Court

concludes that it would be unreasonable to include those attorney's fees in the

judgment against Investment Properties.  Taking into account the reasonable

amount of work required to prosecute this type of case—and utilizing the Court's

own experience in commercial litigation of this sort—this Court concludes that a

reasonable amount of attorney's fees and costs for the procurement of a

$33,620.21 judgment, plus interest, against Investment Properties is $12,000.

## RECOMMENDATION

Based upon the above, and upon all the records, files, and proceedings

herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion Default Judgment as to Defendant Investment

Properties Brooklyn Center, LLC  (Doc. No. 66), be **GRANTED IN PART** and

**DENIED IN PART**, as set forth above; and

2.      Judgment be entered against Defendant Investment Properties Inc.

for a total amount of $71,354.37, including $33,622.21 in past due fees,

$25,732.16 in interest, and $12,000 in attorney's fees and costs

Dated:   August 26, 2011


                              *s/ Jeffrey J. Keyes*
                              JEFFREY J. KEYES
                              United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**September 9, 2011**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within ten days after service thereof.  All briefs filed under
this rule shall be limited to 3500 words.  A judge shall make a de novo
determination of those portions of the Report to which objection is made.  This
Report and Recommendation does not constitute an order or judgment of the
District Court, and it is therefore not appealable directly to the Circuit Court of
Appeals.